# C A S E S

## DECIDED IN THE COURT

# FOR THE CORRECTION OF ERRORS

### OF THE

### STATE OF NEW–YORK,

#### In the Year 1840.

————◄●◄─►●►─

THE NEW-YORK INSURANCE COMPANY, *appellants,* and ROULET and others, *respondents.*

Where a cargo of merchandise, which was insured, was seized and condemned by the French government under the *Berlin* and *Milan decrees,* and a compromise was subsequently made between the underwriters and the assured, by which the latter accepted from the former $5000 in satisfaction of their claim against the underwriters, which was for $15,000, and surrendered the policy, but did not assign or cede the right to claim indemnity from the French government, *it was held,* on the underwriters subsequently obtaining $5000 under the convention between the American and French governments, providing indemnity for spoliation upon our commerce, that the *award* of the *commissioners* under the treaty, giving the money to the underwriters instead of the assured, was not *conclusive* as between the parties, and that the money thus obtained was held *in trust* for the assured, and the underwriters were decreed to pay over the same.

*It was also held,* that though an *action at law* might have been sustained for the recovery of the money, a *bill in equity* was proper; the jurisdiction of the courts in a case like this being concurrent.*

APPEAL from chancery. The respondents filed a bill in chancery before the vice chancellor of the first circuit, in which they stated that John S. Roulet, Joseph Icard and *Gurdon S. Mumford, in No- [ *506 ] vember, 1807, shipped at New-York a cargo of coffee, sugar and logwood, on a voyage to Marseilles in France, of which cargo they were joint owners, and the invoice cost was $57,579,18; that the New-York Insurance Company insured $15,000 of the cargo at a premium of 7 per cent. That the ship and cargo were seized in July, 1808, at Marseilles, under some decree of the emperor of France; that the owners gave security for the appraised value of the cargo, to wit, in the sum of $104,047, to be paid in

case of condemnation. That the cargo was subsequently condemned and the above sum paid. That a claim was made by the owners upon the insurance company for the whole amount insured by them, and an offer made to abandon to the company the right of recovery against the *French government* for the loss in the proportion of $15,000 to the whole amount insured on the cargo. That the company declined to accept the abandoment and to pay the loss. That a *compromise* was thereupon made, by which the company agreed to pay on account of the loss the sum of $5000, and the policy to be given up by the assured; which compromise was carried into effect in March 1809, by the payment of that sum, deducting the premium, and the policy surrendered. The complainants averred that there was *no assignment or cession* of right to recover the subject insured or indemnity therefor, made by the assured or *demanded* by the company. That upon the appointment of commissioners under the convention between the United States and the king of the French, bearing date 4th July, 1831, claims were preferred on behalf of *Roulet*, and the estates of *Icard* and *Mumford*, (the two latter individuals having died,) for an allowance under the provisions of the convention for the loss sustained by the seizure and condemnation of the cargo and the compulsory payment of its appraised value; that the New-York Insurance Company also presented a claim to the commissioners for the sum of $5000 paid by them as *insurers* as aforesaid; that on 31st December, 1835, the commissioners allowed for the whole loss on the cargo the aggregate sum of $50,940, and of that sum *awarded* to the New-York Insurance [ *507 ] Company $5000, *issued to them a certificate for that sum; and that the company have since received payment of part, and now hold the moneys so received, together with the certificate. The complainants pray for a discovery, that the moneys received may be decreed to be paid over, and the certificate to be delivered to them. The bill was filed by *Roulet* in his own name, by *L. F. Varet* as administrator of *Icard*, and by *W. Radcliff* as administrator of *Mumford*. To this bill the defendants demurred. The VICE CHANCELLOR overruled the demurrer, and his decision on appeal was affirmed by the CHANCELLOR. From the decree of the Chancellor the defendants appealed to this court. See the opinions delivered in the courts below, 7 *Paige*, 561, *et seq.*

*G. F. Talman*, for the appellants, insisted upon the following points:

I. The commissioners appointed under the acts of congress, were authorized and required to examine all claims for indemnity, and to determine *who* were entitled to receive, and what amount. Their award upon the respective claims of the parties to this suit, fairly submitted, is final and conclusive. Their decision is the judgment or decree of a competent tribunal of exclusive jurisdiction. 2 *Russell*, 608. 4 *Simon*, 296.

II. The claim of the respondents having been submitted to the commissioners, and rejected by them, their decision is final, and cannot be reviewed by any other tribunal. *Convention with France, Acts of* 1st *Sess. of* 22d *Cong.* 1832, *App. p.* 34. *Act to carry Convention into effect, id. ch.* 199. 4 *Story's Laws,* 2311. *Treaty with Spain,* 6 *Laws of U. S.* 622. *Act to carry into effect Treaty with Spain, id.* 579. 3 *Story's Laws,* 1817. *Reardon* v. *Hill,* 2 *Russ.* 608. 2 *Sim. & Stu.* 434. *Loyd* v. *Trimbleston,* 4 *Simon,* 296. *Comegys* v. *Vasse,* 1 *Peters,* 212. 2 *Swanst.* 551.

III. The award of the commissioners in favor of the appellants was correct and just. They had been damnified by the means mentioned in the treaty to the amount of five thousand dollars. No abandonment, cession or conveyance from the respondents was necessary. The actual payment *of a loss of five thousand dollars was a sufficient sup- [ *508 ] port of their claim for indemnity to that amount. *Graeie* v. *N. Y. Ins. Co.* 8 *Johns. R.* 245. *Phillips on Ins.* 464.

IV. The award in favor of the appellants was for a loss which they had paid to the respondents; if the appellants were not entitled to it, the respondents have no right to recover it from them: the United States alone are entitled to reclaim it.

V. If the respondents were entitled, they had an adequate remedy at law. *Mitf. Pl. ch.* 2, *p.* 123. *Fonbl. Eq. b.* 1, *ch.* 3, § 3. *Law* v. *Thorndike,* 20 *Pick.* 317. 1 *Johns. Ch. R.* 463. 4 *id.* 566. 1 *Peters' C. C. R.* 363. 1 *McCord's Ch. Cas.* 56. 2 *Leigh,* 490.

*G. Wood,* for the respondents, insisted upon the following points:

I. The effect of the award was to determine the amount to be allowed for the property lost by the illegal capture; but the rights of the respective claimants must be subject to examination by courts of law, like any other question of property. *Comyges* v. *Vasse,* 1 *Peters,* 193. *Delafield* v. *Colden,* 1 *Paige,* 139. The intervention of commissioners was for the sole object of determining what claims were *admissible* under the terms of the convention with France. The ordinary rules of evidence might have excluded many just claims, and a tribunal with large discretion was required for the benefit of the claimants themselves. But the same necessity did not exist for the determination of questions between parties claiming the same fund adversely. No power was given to them by law for such purpose. See the report of the commissioners accompanying the list of awards, and *Kane's* notes of some of the questions decided by the commissioners *p.* 60 and 87. They could not therefore decide upon conflicting private rights. Those must be decided by the ordinary tribunals possessed of the requisite powers for such purpose.

II. Upon the facts stated in the bill, the respondents are entitled to the benefit of the award.

[ *509 ]        1. *The claim to indemnity was based upon the loss of property.

2. The owner of the property captured, or the assignee of his right could alone make the claim.

3. The appellants were not the assignees of the right of the respondents. There was no assignment or cession, or abandonment and acceptance, which are the only modes of a legal transfer of the right of the assured. *Comegys* v. *Vasse*, 1 *Peters*, 193. Nor was there any equitable right; payment in full could alone create it. This was a compromise for one third of the amount for which the appellants were liable. The amount released was the price of the claim for indemnity against France, which therefore, by express agreement, vested in and belonged to the respondents.

After advisement, the following opinions were delivered:

By the PRESIDENT of the Senate. The main questions arising in this case are: 1. Is the award of the commissioners under the French treaty final and conclusive upon the rights of the parties litigant here? 2. If not, are the defendants in error entitled to recover from the plaintiffs in error the $5000 received by the latter on the claim presented by them to the commissioners under the French treaty?

This case is, I think, upon both these points very clear.

1. Upon the first point, the vice chancellor was clearly right in saying, that " the awards of the commissioners are only to be considered as ascertaining what were proper claims upon the fund, the amount of the respective claims, and to whom, as between individuals and the government, the money might be legally paid; and not as settling the conflicting rights and equities of third persons, who may be interested, or entitled to participate in the money after the government had parted with it: these being matters more properly belonging to the ordinary tribunals of the country. This is the law of the case of *Comegys* v. *Vasse*, 1 *Peters*, 193, which arose under the

[ *510 ]        Spanish treaty. *See also Sheppard and others* v. *Taylor and others*, 5 *Peters*, 675; *Manro* v. *Almeida*, *10 Wheaton*, 473, and *Willard* v. *Dorr*, 3 *Mason*, 164. To the same effect, also, is the case of *Delafield* v. *Colden*, decided in our own court of chancery. *See* 1 *Paige*, 139.

This is also in strict conformity with the view which the commissioners themselves under the *Spanish treaty* entertained of their own powers, and upon which they acted. See the final report made to the department of state of the United States on the 8th of June, 1824, by the commissioners

under the Florida treaty, where, among other observations, they remark: " But in these and many other cases which occurred, the board having ascertained the full amount of the loss, distributed this amount so ascertained amongst the different parties claiming before them, and seeming to have right to receive it, (no matter in what character,) without deciding or believing itself possessed of the authority to decide upon the merits of the conflicting claims to the same subject. To whom of right the sum thus awarded when paid may belong ; or for whom, how, or in what degree the receiver ought to be regarded as a trustee of the sum received, were questions depending upon the municipal laws of the different states of the union, the application of which to the facts existing in any case, the board did not feel itself authorized to make ; and therefore abstained from instituting any inquiry as to the facts necessary to such a decision. These remarks the commissioners think it proper thus to state, lest their award may be considered as barring and finally settling pretensions, into which this board have, in truth, neither made nor believed itself authorized to make any examination whatever ; but have purposely left it open for the adjudication of others, who will have better means of ascertaining the facts."

The provisions of the *French treaty*, and the act of congress for carrying the same into effect, are not so essentially different from those of the *Spanish treaty*, as to distinguish the case now before this court, so far as regards this first point, from the case of *Comegys* v. *Vasse*, or as to render the principles of law, adopted in that case, inapplicable to the present. This point has been recently fully considered and decided by the supreme court of the United States, in *the case of *Trevall* v.     [ *511 ] *Bache*, 14 *Peters' R.* 95, in which Chief Justice Taney, who delivered the opinion of the court, says : " Upon the first question, (is the decision of the commissioners appointed under the treaty with France, conclusive upon the rights of the parties ?) the court have entertained no doubt. This case cannot, we think, be distinguished from the cases of *Comegys* v. *Vasse* and *Sheppard and others* v. *Taylor and others*. It has been argued, on the part of the appellee, that these cases were decided under the treaty with Spain ; and that the language of that treaty and of the act of congress creating the board of commissioners under it, differs materially from the treaty and act of congress under consideration, when defining the powers of the board. It is true that there is some difference in the words used ; but, in our judgment, they mean the same thing. The rules by which the board is directed to govern itself in deciding the cases that come before it, and the manner in which it was constituted and organized, show the purpose for which it was created. It was established for the purpose of deciding what claims were entitled to share in the indemnity promised by the treaty ; and they, of course, awarded the amount to such person as ap-

peared, from the papers before them, to be the rightful claimant. But there is nothing in the frame of the law establishing this board, or in the manner of constituting and organizing it, that would lead us to infer that larger powers were intended to be given than those conferred upon the commissioners under the Spanish treaty. The plea therefore, put in by the defendant in bar of the complainants' bill cannot be sustained, and the case is fully open before this court upon its merits." It will be perceived that this is a decision directly in point. It has, therefore, I think, been clearly shown that the first point in this case has already been conclusively decided in the negative.

2. As to the *second point*, I think there can be as little doubt as upon the first.

The plaintiffs in error, insurers in this case, having refused to accept an abandonment of the cargo, after due notice of its seizure and [ *512 ] condemnation by the French government, *under its decrees, and having refused, when required by the defendants in error, to pay as for a total loss ; and having compromised the claim by a partial payment of only $5000 instead of $15,000, the amount insured, they thereby voluntarily renounced all interest in the cargo, and all participation in the *spes recuperandi* of the same ; so that if the property itself, or either a full or partial indemnity therefor should, at any time thereafter, be recovered, it should be for the exclusive benefit of the assured, into whosoever hands the same might come or be ; and the same would be the case whether such recovery were of the property itself specifically, or of an indemnity therefor. This point was expressly decided in the case above cited, of *Sheppard and others* v. *Taylor and others*, where it was said, " There is no difference between the case of a restitution in specie of the ship itself, and a restitution in value." The $5000 received by the plaintiffs in error under the French treaty, being a portion of the indemnity for the cargo seized and sequestered in this case, the defendants in error are entitled thereto, and should be permitted to recover the same in this proceeding, as I have no doubt they might have done at law, in the equitable action of assumpsit for money had and received. The difficulties, however, attending this latter remedy, arising out of the peculiar condition of the parties in interest, at the time of filing their bill in equity, as suggested by the vice chancellor, were, with the other reasons given by him, quite sufficient to justify his entertaining the jurisdiction which he undoubtedly had of this case. His decree is, I think, in all respects right. The decree of the chancellor, therefore, affirming that of the vice chancellor, should be *affirmed*.

By *Chief Justice* NELSON. The appellants claim a reversal of the decree below on three grounds : 1. That the award of the commissioners un-

der the French treaty is conclusive in favor of their right to the fund; 2. That independently of the award, they are entitled to it upon the merits; and 3. The remedy, if any, is at law.

The cases referred to by the chancellor, I think *decisive     [ *513 ] against their first position.   The award is conclusive only, in respect to the validity of the claim for compensation under the treaty, and the amount.   It did not necessarily involve a consideration of the equitable or legal rights of third persons to the fund—questions growing out of these rights are to be heard and determined in the ordinary course of judicial proceedings.

The title of conflicting claimants may have been, in some measure involved in the examinations of the commissioners preparatory to a distribution; but this was only as between the individuals and the government with a view to ascertain the extent of the claims upon the fund, and the persons to whom it might be properly paid.   Demands upon it arising out of the previous dealings of the original claimants were independent of the treaty or law of congress : they stood on the footing of contract express or implied between the individual parties, the final adjustment of which was not material to the proper execution of the duties of the commissioners.   They had neither time for a careful investigation of such extraneous matters, nor was it practicable for the parties to furnish the requisite proof.

On the *second ground* it seems to me also plain the appellants fail to show any right.   The bill charges that they had no interest in the cargo seized, as they rejected the abandonment when offered by the assured, and refused to pay for a total loss.   They failed, therefore, to put themselves in their place, or to lay any foundation for claim to indemnity.

It is insisted, however, that the subsequent compromise between the parties in pursuance of which the appellants paid *one third* of the insurance money, ($5000) had the effect to subrogate them, *pro tanto*, to the rights of the assured against the French government.   The bill states that there was no abandonment, assignment, or cession of right to recover the subject insured, or any part thereof, or any demand for the same at the time of the compromise.   We are bound to assume, therefore, that it was made without any stipulation for a corresponding interest in the claim upon the government—in the *spes recuperandi*—and that the *underwriters     [ *514 ] preferred paying the $5000, and relinquishing the expectation of indemnity, to the payment of a total loss which was $15,000, with the benefit of it; or to state the other side of the arrangement—the assured released the insurance company from payment of the $15,000 and assumed the hazard of the claim upon the French government in consideration of the payment of the $5000.   This I think the necessary conclusion from the facts stated in the bill and admitted by the demand.

Although an action at law for money had and received might have been maintained by the surviving owner of the cargo against the company from the equitable nature of this remedy, as understood since the time of Lord Mansfield, it cannot I think, be doubted, the subject was also one of chancery jurisdiction. Simple trusts are now regarded at law, and the duty frequently enforced ; but it would be too much to say that this somewhat modern extension of the remedy at law had the effect to oust a court of equity of its original cognizance of the subject matter. There are many subjects of judicial investigation, over which the two courts have concurrent jurisdiction. This is one of 'them. Whether the arrangement is a wise one or not, must be left to the legislature. It is not to be presumed that the two tribunals, acting upon somewhat adverse principles, could settle the boundary without expensive, if not vexatious litigation.

Upon the whole I am of opinion the decree should be affirmed.

By *Senator* EDWARDS. It appears to me the chancellor and vice chancellor are right in the conclusions to which they have come, relative to the effect of the award of the commissioners upon the conflicting rights of parties as between each other. The duty of the commissioners is declared in the act providing for their appointment, viz. to receive and examine all claims which may be presented to them under the convention between the United States and France, of the 4th of July, 1831, which are provided for by [ *515 ] said convention according *to the provisions of the same, and the principles of justice, equity and the laws of nations. 1 *Sess.* 22 *Cong. ch.* 199, § 1. The object for which they were appointed appears to be to ascertain the number of claims of American citizens against the French government, which fell within the provisions of the treaty, and the amount of each claim, that a proper distribution of the twenty five millions of francs might be made amongst the claimants ; and as the money to be paid by the French government, was to liberate it completely from all the reclamations preferred against it by citizens of the United States, it was necessary that their awards should be final and conclusive between the claimants and the French government, to fulfil the conditions on which the money was to be paid, and the terms of the treaty. The amount, when paid by the French government, exonerated it from any further liability to those claims under the treaty ; and the due proportion of that amount paid to each individual in whose favor the commissioners made their award, discharged our government from any further liability, on account of the claims presented, and the principal object in naming the individual in the award, was to designate the person who might receive the money, and discharge the government from its trust. In negotiating the treaty, the government were but the agents of the individuals holding these claims, and received the money for their benefit.

The claims being the property of individuals, were assignable, and who eventually would be legally entitled to the money the government could not know, unless it was empowered to call the parties and witnesses before some tribunal, and determine the question in a legal form.

But in what tribunal could the conflicting rights of these claimants be settled ? The claimants are citizens of this state. Congress could not authorize commissioners to form such a tribunal, nor could they institute a new tribunal with sufficient powers to adjudicate the matter in controversy between these parties. By sec. 1, of the second article of the constitution, the judicial power of the United States shall be vested in one supreme court, and such inferior *courts as congress may from time to time ordain [ *516 ] and establish. But the judicial power of these forums do not extend to controversies between citizens of the same state, except where they claim lands under grants of different states. See 2d article, Const. U. States. Congress therefore could not constitute a tribunal with exclusive jurisdiction over the rights of these parties. It is manifest therefore to my mind, that no tribunal has passed upon these claims, which had the power to render a judgment final and conclusive between the parties. Nothing short of an absolute agreement between the parties could constitute the commissioners arbitrators, so as to make their award final and conclusive, as to the conflicting claims of the parties. But it is not pretended any such agreement has been consummated between them. As I come to the conclusion therefore that the award is not final and conclusive between the parties in determining their rights ; the next question is, what are the equities in the bill as admitted by the demurrer ?

It is difficult to conceive from the statements in the bill how the insurance company could make out a claim before the commissioners that should entitle them to an award for the $5000. True it is, the company had paid that sum, but under what circumstances ? They had insured to the amount of $15,000 on the cargo of the vessel, and in consequence of the loss of the cargo, the owners had a claim against them for that amount, and in order to buy off their liability and to free and discharge themselves from the payment of the $15,000, in consequence of the loss, they agree to pay and do pay $5000, without taking any interest whatever in the *spes recuperandi* of the property lost—and even refuse to hold such interest. It appears to me, therefore, they relinquish all claim whatever to the money, or any portion of it paid on account of the loss of the cargo. I am aware that an *abandonment* is not necessary to give the insured a right to receive the proceeds of claims arising from losses which have been paid. A mere payment of a loss, whether partial or total, gives the insurers an equitable title to what may be afterwards recovered from other *parties on account [ *517 ] of the loss. 1 *Phillips on Ins.* 464. But it is on the principle

that the insurer is considered as purchasing the property as far as he pays or is liable to pay for the loss. 1 *Phil. on Ins.* 465. And had the insurers in this case paid the amount they had agreed to pay by the terms of their policy, they would have been so considered, and entitled to their portion of the amount paid by the French government for the loss, whether the owners abandoned or not. But how could they retain the situation which their policy gave them as presumptive purchasers, without complying with the terms of the policy? Will it be said the owners had a right to consent to a modification, and still permit them to occupy the same standing in point of interest? Undoubtedly they had. But did they do so? The owner consented to relinquish the payment of $15,000 for $5,000, and offered to the insurers an abandonment of the cargo, which offer was declined on the part of the underwriters. How, therefore, could this negotiation which cancelled the policy, give the insurers any interest in the property? The law cannot imply an interest against the absolute refusal of the party to take such interest, nor can a court of equity help out such a claim.

The doctrine laid down in *Gracie* v. *N. Y. Ins. Co.* 8 *Johns. R.* 244, that the assured is never obliged to abandon, and if he does not, he is always entitled to recover to the extent of his loss, I consider entirely correct. But if the whole amount of loss is recovered by the assured and they have received a portion of the loss from the underwriters of a policy, without any relinquishment of the *spes recuperandi* by such underwriters, the portion of the amount of the loss thus received is received in trust for the underwriters. In *Randall* v. *Cochran*, 1 *Vesey, sen.* 98, the commissioners appointed to adjust the losses sustained by unjust captures, would not suffer the insurers to make claim to part of the prizes, but the owners only, although they were satisfied for their loss by the insurers. The lord chancellor said he " was of the opinion that the plaintiffs had the plainest equity that could be. The person originally sustaining the loss was the owner; but after [ *518 ] *satisfaction made to him the insurer. No doubt but from that time, as to the goods themselves, if restored in specie, or compensation made for them, the assured stands as a trustee for the insurer, in proportion for what he paid." And on the same principle, if the insurance company have received the $5000, which, as the bill states, was a part of the aggregate sum of $50,940 awarded, for the whole loss on the cargo, after having refused to pay the amount of the policy and accept of an abandonment, I see no reason why they have not received the money without any legal or equitable claim whatever, and why they should not be considered as holding it in trust for the owners of the cargo, or their representatives.

It appears to me, this is one of those cases in which the insurance company cannot conscientiously hold the $5000 received—having absolutely de-

clined to pay the amount of their policy and accept of the abandonment; and if so, a court of equity may entertain jurisdiction. Mr. Justice *Story*, says : " One of the most common cases in which a court of equity acts upon the ground of implied trusts, *in invitum* is, where a party has received money which he cannot conscientiously hold from another party." 2 *Story's Eq.* 501. The receipt of money under such circumstances, in equity, raises an implied trust. 2 *Fonbl. Eq. Book* 2, *ch.* 1, § 1, *note b.* 2 *Story's Eq.* 501, 502. It is true that courts of law in the action for money had and received, have now jurisdiction of most of this class of cases, and furnish an adequate remedy when sufficient facts can be proved without calling upon the defendant to disclose them. 2 *Story's Eq.* 502 *and cases there cited.* In *Law* v. *Thorndike*, 20 *Pick. R.* 320, the bill which was filed under this same French treaty was dismissed, on the ground that the plaintiff had an ample remedy at law in an action for money had and received, if he was entitled to recover. That case, however, was put upon the ground, that it was unnecessary for the plaintiff to come into the court for a discovery of facts. The court say, " the plaintiff has no need to come into a court of equity for a discovery. The facts upon which the right is claimed are all susceptible of *proof. The defendant standing in a repre- [ *519 ] seentative character, cannot be presumed to be personally acquainted with any material facts within his own knowledge, requiring a discovery. But it is not so in the case under review. The appellants against whom the claim is made are the original parties, and the bill calls upon them to answer under oath the allegations in the bill for the purpose of affording the necessary evidence ; and also calls upon them to discover the amount paid to them upon the certificate issued. It appears to me, under such circumstances, we are not at liberty to infer that the party could make the necessary proof to recover at law, in an action for money had and received, and on that ground to say the bill should have been dismissed. I am for affirming the decree of the chancellor in overruling the demurrer.

On the question being put, *Shall this decree be reversed ?* All the members of the court present, who had heard the argument, answered in the negative. Whereupon the decree of the chancellor was AFFIRMED.

---

*THE PEOPLE *vs.* WHITE.* [ *520 ]

Where in an indictment for *murder* the crime is charged to have been committed with a *premeditated design to effect the death of the person killed,* the premeditated design or *express malice* must be proved, or the prisoner cannot be convicted, although the act be *also* charged to have

* Decided 28th December, 1840.